# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

MICHELLE B. BALDWIN,      )
     )
     Plaintiff,      )
     )
     vs.      )      **Case No. 1:11CV00147 (LMB)**
     )
MICHAEL J. ASTRUE      )
Commissioner of Social Security,      )
     )
     Defendant.      )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Michelle B. Baldwin for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 12). Defendant filed a Brief in Support of the Answer. (Doc. No. 15). Plaintiff has filed a Reply Brief. (Doc. No. 18).

## Procedural History

On January 28, 2008, plaintiff filed an application for Disability Insurance Benefits and Supplemental Security Income, claiming that she became unable to work due to her disabling condition on April 23, 2007. (Tr. 124-139). This claim was denied initially and, following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 3, 2010. (Tr. 58-59, 4-15). Plaintiff then filed a request for review of

the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 24, 2011. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on February 8, 2010. (Tr.18). Plaintiff was present and was not represented by counsel. (Tr. 20). The ALJ noted that a vocational expert, Vincent Stock, was present. (Tr. 25).

The ALJ informed plaintiff of persons, including attorneys, who could act as a representative, and informed plaintiff of all the benefits of having a representative manage the case on plaintiff's behalf. (Tr. 21-23). The ALJ informed plaintiff that he would grant her a continuance if she wished to obtain a representative. (Tr. 24). Plaintiff chose to proceed with the hearing. (Id.).

The ALJ examined plaintiff, who testified that she lives with her husband and two children. (Tr. 26). Plaintiff stated that she has trouble climbing steps. (Tr. 27). Plaintiff testified that she drives approximately forty-five miles each week. (Id.).

Plaintiff stated that she completed twelfth grade and graduated in 1986. (Tr. 28). Plaintiff testified that she received some Certified Nurses' Aide ("CNA") training in 1993, but was unsure if she was still certified. (Id.). Plaintiff stated that she had received a dental assistant certificate from a technical school. (Tr. 29). Plaintiff testified that she was not working at the time of the hearing. (Id.).

Plaintiff stated that she worked until December of 2009. (Id.). Plaintiff testified that she

had been working for AO Incorporated as a receptionist for two hours each day, five days per week. (Tr. 30). Plaintiff explained that she stopped working for AO Incorporated because she was fired for reporting another worker. (Id.). Plaintiff testified that, as a receptionist, she answered the phone, took messages, and took out the trash. (Id.). Plaintiff stated that the trash was the heaviest thing she lifted, that she was unsure of its weight, but that it caused her "a lot of pain and stiffness." (Id.). Plaintiff testified that she worked as a receptionist at AO Incorporated for approximately one and one-half years. (Tr. 31).

Plaintiff testified that she worked as a line worker for Proctor and Gamble for approximately three months off and on. (Id.). Plaintiff stated that she packed paper towels and toilet paper into boxes while employed at Proctor and Gamble. (Id.). Plaintiff testified that the heaviest thing she lifted at this job was a package of nine rolls of tissue, or a package of eight rolls of paper towels. (Id.). Plaintiff explained that the boxes were on conveyor belts. (Id.).

Plaintiff testified that she worked at McDonald's for one day. (Tr. 32). Plaintiff stated that she left that job because she was not able to lift the french fries, but was unsure of the weight of the french fries. (Id.).

Plaintiff testified that she worked in child care for approximately two or three months and left the position because she could not lift the children. (Tr.32-33). Plaintiff testified that the heaviest child she lifted while at this job was an infant weighing approximately eighteen pounds. (Tr. 33).

Plaintiff testified that she had worked as a CNA in 2007, 1998, and 1995. (Id.). Plaintiff stated that while employed as a CNA she had to lift patients. (Id.). Plaintiff stated that lifting a patient caused her injury in December of 2006. (Id.). Plaintiff explained that she and others were

trying to lift a patient that was on the floor and that when plaintiff "came up with him" she was injured. (Id.).

Plaintiff testified that at Proctor and Gamble, she worked as a line worker in 1996, 1997, 1999; and as a packer in 2007. (Tr. 34). Plaintiff stated that she packed toilet paper, paper towels, and sanitary napkins into boxes at these positions. (Id.).

Plaintiff testified that her disability began on April 23, 2007. (Tr. 35). Plaintiff testified that she wakes up around six in the morning, showers, dresses herself, and calls her children. (Id.). Plaintiff stated that she cooks meals. (Id.). Plaintiff stated that both she and her husband do laundry, but that her husband does the majority of the laundry. (Id.). Plaintiff testified that she washes dishes, makes beds, vacuums, mops, and sweeps. (Tr. 36). Plaintiff stated that she shops for groceries and has not had any problems getting along with people who are in the grocery store. (Id.). Plaintiff testified that she does the grocery shopping by herself. (Id.). Plaintiff stated that she has the store employees separate the groceries so that they do not exceed a weight of twenty pounds. (Id.).

Plaintiff stated that she did not have friends but considers herself sociable. (Id.). Plaintiff testified that she "sometimes" gets along with her husband and children. (Tr. 36-37). Plaintiff stated that she is active in church and that she helps "clean up a little bit" at church. (Tr. 37). Plaintiff testified that, throughout the day, she watches television, reads the Bible, and reads magazines. (Id.). Plaintiff stated that she cleans her house, but that it is difficult, because bending and stooping are "kind of painful." (Tr. 38). Plaintiff stated that she generally spends her afternoons talking on the phone, talking to her husband, watching television, and reading. (Id.).

Plaintiff testified that she stays at home a lot, because she is "paranoid" that something will

happen to her. (Id.). Plaintiff stated that she plays games on her computer. (Tr. 38-39). Plaintiff stated that she cannot go out to games, because sitting on bleachers is painful. (Tr. 39). Plaintiff stated that she only goes out if her husband takes her. (Id.). Plaintiff stated that she visits her mother and that the drive is approximately thirty-five miles. (Id.). Plaintiff testified that it is difficult for her to sit in the bathtub so she generally takes showers. (Tr. 40).

Plaintiff testified that she has had diabetes mellitus[1] for approximately two years and is taking Metformin pills[2] for her diabetes. (Id.). Plaintiff stated that her diabetes causes blurred vision and tingling in the hands and feet. (Tr. 40-41). Plaintiff stated that she takes over-the-counter Motrin approximately once per day at bedtime. (Tr. 41). Plaintiff stated that she was also taking a muscle relaxer, in addition to the Metformin and Motrin. (Id.). Plaintiff was unable to remember the name of the muscle relaxers that were prescribed to her, but the ALJ noted that her file listed Flexeril[3] and Naprosyn.[4] (Id.). Plaintiff explained that she stopped taking the muscle relaxers because they were making her sick. (Id.). Plaintiff further explained that she might take one muscle relaxer if her "back really, really hurt..." (Id.). Plaintiff stated that she takes ibuprofen sometimes. (Id.). Plaintiff stated that she experienced weakness as a side-effect

---

[1] A chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced. It is caused by an absolute or relative deficiency of insulin. Stedman's Medical Dictionary, 529 (28th Ed. 2006).

[2] Metformin is indicated to improve glycemic control in adults with type 2 diabetes mellitus. Physician's Desk Reference, ("PDR"), 2041 (63rd Ed. 2009).

[3] Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1931.

[4] Naprosyn, also referred to as Naproxen, is a non-steroidal anti-inflammatory drug indicated for the management of pain as well as for the treatment of arthritis. See PDR at 2632-2633.

from her medications.  (Id.).  Plaintiff again stated that she takes medication sometimes, if her "back is really, really hurting."  (Id.).

Plaintiff testified that her diabetes is under control.  (Id.).  Plaintiff testified that she has undergone a back x-ray and an MRI.  (Tr. 43).  Plaintiff stated that she was told she has degenerative disc disease,[5] and herniated discs[6] at L4, L5, L5, and S1.[7]  (Id.).

Plaintiff testified that she completed a function report in February of 2008, at which time she was employed at Quality Packing.  (Tr. 43).  Plaintiff stated that she did pay bills, fill out money orders, and count change at the time she filled out the function report.  (Id.).  Plaintiff explained that, at that time, her husband was not there, that he "just moved back in" and so he mostly handles those responsibilities.  (Id.).  Plaintiff testified that she still irons clothing.  (Tr. 44).  Plaintiff stated that her husband takes out the trash, but explained that she does basic home repairs, such as changing light bulbs.  (Id.).  Plaintiff stated that she goes to the bank and post office occasionally.  (Id.).  Plaintiff testified that she still walks her dog.  (Id.).

Plaintiff stated that, on a scale of one to ten, her back pain is usually a four or five.  (Id.).  Plaintiff testified that when her pain is a nine out of ten she takes Motrin and goes to sleep.  (Tr.

---

[5] A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

[6] A protrusion of a degenerated or fragmented intervertebral disc into the spinal canal.  Stedman's at 549.

[7] In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

45).  Plaintiff testified that if she does not "do any lifting, then [she is] okay," but if she does lifting she has "real bad muscle spasms," and pain in her "lower back to where [she] can't hardly walk."  (Id.).

Plaintiff testified that, while at home, she is usually in a "recliner position."  (Id.).  Plaintiff stated that she was in a car accident in June of 2009 and has since had difficulty putting her shoulders down.  (Id.).  Plaintiff stated that the car accident "made the lifting even worse."  (Id.).  Plaintiff testified that she was examined at the hospital after the car accident and that the hospital allowed her to go home.  (Tr. 46).  Plaintiff testified that, since that visit, she underwent x-rays, which revealed no abnormalities.  (Id.).

Plaintiff stated that, mentally, she feels bad, because she cannot work and has to depend on others to do "simple things" for her.  (Id.).  Plaintiff testified that she cries every day, has problems with anxiety, and has had anxiety attacks.  (Id.).  Plaintiff stated that she has never taken medication for anxiety, but she has seen a psychiatrist.  (Tr. 47).  Plaintiff stated that she was not currently under the care of a psychiatrist.  (Id.).  Plaintiff stated that she had been in a mental hospital before but was unable to remember when this occurred.  (Id.).  Plaintiff testified that she had never made any attempts on her own life.  (Id.).  Plaintiff testified that she had tried to scare people, but never really tried to hurt anyone.  (Id.).  Plaintiff stated that she is moody and gets mad when people tell her about her disability.  (Tr. 48).  Plaintiff testified that she hallucinates. (Id.).  Plaintiff explained that she believes that her medicine is the cause of her hallucinations. (Id.).  Plaintiff testified that she was hallucinating during the hearing and stated that she saw people in the room who were not there.  (Id.).  Plaintiff stated that her concentration is "not good", but that it depends on the people around her.  (Id.).  Plaintiff explained that if those

around her are calm, she is calm, but if they are nervous, then she becomes nervous. (Id.).

Plaintiff stated that she cooks, but cannot follow a recipe. (Id.). Plaintiff testified that she experiences back pain when she leans backward in a chair, so she has to lean forward while seated. (Tr. 49). Plaintiff stated that she was unsure how long she could stand, because she has to lean on something. (Id.). Plaintiff testified that she can walk around the store and that "once [she] get[s] walking, [she] walk[s] pretty good." (Id.). Plaintiff stated that she is not able to lift twenty pounds. (Id.). Plaintiff testified that she can bend, stoop, crouch, kneel, crawl, and climb steps, but that it is difficult to do so. (Id.). Plaintiff explained that when walking up steps she has to use the bannister for support. (Id.).

The ALJ next examined the vocational expert, Vincent Stock. Mr. Stock asked plaintiff what the largest amount of weight was that she had to lift while employed as an assembly line person from 1996 to 1999. (Tr. 51). Plaintiff responded that it was no more than ten pounds. (Id.).

Mr. Stock testified that plaintiff's position as a CNA was a medium level job, but that plaintiff performed it at a heavy level. (Id.). Mr. Stock testified that the assembly line position was a medium level job and that plaintiff performed it at the light level. (Tr. 52). Mr. Stock stated that the daycare provider position was a light job. (Id.). Mr. Stock testified that plaintiff's packer position was a light job. (Tr. 52).

The ALJ then asked Mr. Stock to assume a hypothetical claimant with plaintiff's characteristics and the following limitations: able to lift, carry, push, and pull twenty pounds occasionally, and ten pounds frequently; sit, stand, and walk six hours in an eight-hour workday; occasionally climb, balance, stoop, crouch, kneel, or crawl; and could handle occasional exposure

to ladders, ropes, and scaffolds. (Tr. 52-53). Mr. Stock testified that there would not be any transferrable work skills for the hypothetical claimant. (Tr. 53). Mr. Stock testified that the claimant would be capable of performing the assembly line position as plaintiff performed it, but not as it is ordinarily performed in the national economy. (Id.). Mr. Stock stated that the claimant could also perform the daycare position and the packer position. (Id.). Mr. Stock testified that the assembly line position was medium in exertion. (Id.).

Mr. Stock testified that the hypothetical claimant could perform other positions at the light level, including a housekeeping position (10,000 positions in the State of Missouri, 400,000 in the national economy); and a cashier position (10,000 positions in the State of Missouri, 400,000 in the national economy). (Tr. 54). Mr. Stock stated that both of these positions are unskilled and light in exertion. (Id.). Mr. Stock further testified that the examples he provided were representative and not exhaustive. (Id.).

The ALJ asked plaintiff if she had any questions for Mr. Stock. (Id.). Plaintiff testified that she did not, and the ALJ then concluded the hearing. (Id.).

**B.    Relevant Medical Records**

The record reveals that plaintiff presented to the emergency room at Saint Francis Medical Center on February 22, 2007, with complaints of experiencing dizziness on and off throughout the month. (Tr. 325). Plaintiff underwent a CT scan of the head, which was normal. (Tr. 329).

On April 23, 2007, plaintiff presented to the emergency room of Saint Francis Medical Center, with complaints of pain in the back and down both legs. (Tr. 314). Plaintiff reported that she had injured her back while lifting a patient at work. (Id.). Upon physical examination, Paul Mackey, N.P. noted that examination of plaintiff's low back area elicited a tender painful response

to deep palpation. (Id.). Mr. Mackey also noted that palpation in the lower thoracic upper lumbar area triggered a sharp shooting pain down the left hip and leg. (Id.). Mr. Mackey stated that plaintiff could ambulate in a stooped fashion, and that plaintiff preferred to stand instead of sit on the examination table. (Id.). Mr. Mackey diagnosed plaintiff with low back strain. (Id.). Mr. Mackey prescribed Motrin and Skelaxin,[8] and recommended that plaintiff use an ice pack. (Id.). Mr. Mackey found that plaintiff could return to limited duty on her current shift. (Id.). Mr. Mackey restricted plaintiff from lifting, pushing, or pulling over ten pounds; repetitive stooping, crawling, climbing or squatting; and repetitive bending or twisting of the back. (Id.). Mr. Mackey noted that plaintiff should be able to alternate between sitting, standing and walking as tolerated. (Id.).

On April 27, 2007, plaintiff presented to Glen E. Cooper, D.O. at Saint Francis Medical Center Occupational Medicine, with complaints of aching in the lateral portion of the left calf and an aching sensation in the lateral portion of the right thigh. (Tr. 317). Upon physical examination, Dr. Cooper found that, during the standing exam, plaintiff could forward bend and place the tips of her fingers at about knee level with end range of motion pain. (Id.). Backward bending and side-bending right were limited to ten degrees by pain, and side-bending to the left was about twenty degrees and relatively pain free. (Id.). Seated straight leg raising was negative, and supine straight leg raising was negative to seventy degrees. (Id.). Dr. Cooper diagnosed plaintiff with low back pain secondary to lumbar strain, with referred pain to bilateral lower extremities. (Id.). He continued plaintiff on the ibuprofen and Skelaxin at bedtime. (Id.). Dr.

---

[8] Skelaxin is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. See PDR, supra, at 1785.

Cooper also continued plaintiff's work restrictions. (Id.).

On May 4, 2007, plaintiff presented to Dr. Cooper, at which time she reported some improvement and informed Dr. Cooper that she was only taking 400 milligrams of ibuprofen twice a day. (Tr. 318). Plaintiff rated her pain as about a three on a scale of one to ten. (Id.). Plaintiff reported some low back pain with a tingling sensation in the right lateral thigh, and the fourth and fifth digits of the right foot. (Id.). Plaintiff also complained of aching in the left leg that extended to the mid calf. (Id.). Upon physical examination, Dr. Cooper noted that, at the standing exam, plaintiff could forward bend and place the tips of her fingers at about knee level with pain. (Id.). Plaintiff's side bending to the right and backward bending were limited to only ten degrees by pain. (Id.). Plaintiff's side bending to the left was twenty degrees and relatively pain free. (Id.). Plaintiff's straight leg raising test was negative. (Id.). Plaintiff reported tenderness to palpation at the lumbosacral junction and also primarily at the left sacroiliac ("SI") joint.[9] (Id.). Dr. Cooper diagnosed plaintiff with low back pain secondary to lumbar strain with referred pain to the left leg and paresthesia[10] to the fourth and fifth digits of the right foot. (Id.). Dr. Cooper continued plaintiff's restrictions and medications. (Id.). Dr. Cooper noted that plaintiff had slight improvement, but was not taking medications at an effective level to help control her pain. (Id.). He advised plaintiff that she could take her medications at the 600 milligram level at least three times a day to help with discomfort and inflammation. (Id.).

On May 11, 2007, plaintiff presented to Dr. Cooper, at which time she reported that she

---

[9]The sacroiliac joint is the joint formed by the sacrum and ilium where they meet on either side of the lower back. Stedman's at 1015.

[10] A spontaneous abnormal usually nonpainful sensation. Stedman's at 1425.

was improving and had less back pain. (Tr. 307). Plaintiff complained of a very small ache in the lateral calf of her left leg, with occasional tingling in the lateral thigh and calf. (Id.). Upon physical examination, plaintiff's straight leg raising test was negative in both the supine and seated position. (Id.). Dr. Cooper noted that plaintiff was able to forward bend and place the tips of her fingers at mid-shin in the standing position. (Id.). Dr. Cooper stated that plaintiff's x-rays were well within normal limits. (Id.). Dr. Cooper found that, neurologically, the plaintiff was intact. (Id.). Dr. Cooper stated that plaintiff's back pain was much improved and that the pain and paresthesia of plaintiff's left leg had improved as well. (Id.). Dr. Cooper noted that plaintiff was making good progress, but needed to continue on modified duty until seen again. (Id.). Dr. Cooper taught plaintiff exercises to help her low back, and prescribed Naprosyn. (Id.). Dr. Cooper noted that plaintiff was apprehensive about medication. (Id.).

On May 16, 2007, plaintiff presented to Dr. Cooper for a follow-up visit, at which time she complained of some increasing pain in her low back, with symptoms of tingling in her left lateral thigh and the fourth and fifth digits of her left foot, as well as tingling in the fourth and fifth digits of her right foot. (Tr. 309). Plaintiff reported that it was painful to do the exercises Dr. Cooper prescribed. (Id.). Plaintiff reported that she was unable to tolerate the anti-inflammatory without stomach pain. (Id.). Upon physical examination, Dr. Cooper found that plaintiff could forward bend and place the tips of her fingers only at the mid-thigh. (Id.). Plaintiff's backward bending was limited to ten degrees, and there was sharp pain at the end range of motion. (Id.). Plaintiff's side bending was limited to ten degrees by pain. (Id.). Deep tendon reflexes were absent at plaintiff's knees and ankles. (Id.). Plaintiff's straight leg raising was positive before full extension in the seated position for low back pain and some left leg pain. (Id.). Dr. Cooper

diagnosed plaintiff with low back pain secondary to lumbar strain, with increased symptoms; and pain and paresthesia to bilateral lower extremities. (Id.). Dr. Cooper recommended that plaintiff undergo an MRI of the lumbar spine due to the neurologic signs and symptoms. (Id.). Dr. Cooper noted that plaintiff would need an open MRI, because plaintiff is very claustrophobic. (Id.).

On June 11, 2007, plaintiff presented to Dr. Cooper, at which time plaintiff reported that she was much improved and stated that she had been performing stretching at home. (Tr. 321). Upon physical examination, Dr. Cooper found that plaintiff could bend forward and place the tips of her fingers at about mid-shin level. (Id.). Dr. Cooper noted that this was a considerable improvement over plaintiff's last examination. (Id.). Plaintiff was able to side-bend right and left and backward bend fully twenty degrees with no discomfort. (Id.). Dr. Cooper found that plaintiff's discomfort was an aching sensation that appeared to be at the left posterior superior iliac spine. (Id.). There was also tenderness at the lumbosacral junction on the left. (Id.). Firm palpation over the left hip caused symptoms of referred pain in the posterior thigh and posterior calf. (Id.). Dr. Cooper found that it appeared to be referred pain and not radicular pain. (Id.). In the seated examination, straight leg raising was negative, and plaintiff's reflexes were intact. (Id.). Dr. Cooper diagnosed plaintiff with low back pain secondary to lumbar strain, much improved; and degenerative disc disease at L4/5 and L5/S1. (Id.). Dr. Cooper found that plaintiff's MRI revealed facet hypertrophy[11] at the lower two levels of the spine including L4/L5 and L5/S1. (Id.). At these levels, Dr. Cooper found that there was some central disc bulging, however, it

---

[11]Enlargement of the facet joints, which are bones present in the vertebrae in the spine. See Stedman's at 690, 929.

appeared to be simply degenerative disc disease.  (Id.).  Dr. Cooper noted that it seemed the

plaintiff had superimposed a strain/sprain upon pre-existing degenerative disc disease of the

lumbar spine.  (Id.).  Dr. Cooper found that plaintiff did not appear to be a surgical candidate.

(Id.).  Dr. Cooper stated that plaintiff was making good progress and that her overall prognosis

was good.  (Id.).  Dr. Cooper noted that plaintiff wanted to try full unrestricted duty, and that

there was no medical contraindication to plaintiff doing so.  (Id.).

On June 26, 2007, plaintiff presented to Dr. Cooper, reporting that she had re-injured

herself at work on June 25, 2007.  (Tr. 319).  Plaintiff stated that she attempted to catch a falling

patient and direct her body toward a chair.  (Id.).  Plaintiff reported that, at the time of the

incident, she experienced the exacerbation of her low back pain and the return of her left leg pain

that extended to her left heel and lateral calf.  (Id.).  Dr. Cooper noted that in the standing

examination, plaintiff localized her pain at the lumbosacral junction and stated that it extended

through the left buttock, posterior thigh, lateral calf, and into the foot.  (Id.).  Plaintiff's seated

straight leg raising test was positive on the left, and plaintiff was unable to fully extend her leg

without leaning backwards.  (Id.).  Plaintiff's straight leg raising in the seated position on the right

was negative, and her straight leg raising in the supine position on the left was positive at about

sixty degrees for pain to the foot.  (Id.).  Plaintiff's straight leg raising on the right unaffected side

was negative to greater than seventy degrees.  (Id.).  Dr. Cooper diagnosed plaintiff with low

back pain secondary to lumbar strain with left leg pain and paresthesia; and early degenerative

disc disease and facet arthritis at L4/L5.  (Id.).  Dr. Cooper placed plaintiff back on work

restrictions and referred her to an orthopedic specialist.  (Id.).  Dr. Cooper noted that an epidural

steroid series was indicated and stated that therapy might be helpful in the short term.  (Id.).

On July 27, 2007, Marsha Toll, Psy.D completed a Psychiatric Review Technique. (Tr. 333-43). Dr. Toll found that plaintiff had no medically determinable impairment. (Tr. 333). Dr. Toll noted that plaintiff had never sought counseling for depression, been given any medication for depression, or complained of psychological symptoms during treatment for her physical problems. (Tr. 343).

On August 1, 2007, plaintiff presented to Jimmy Bowen, M.D. at Orthopaedic Associates in Cape Girardeau, Missouri. (Tr. 346). Plaintiff reported that her pain had never actually disappeared since the original injury in April. (Tr. 347). Plaintiff reported that her pain was almost exclusively in the left side of her low back but radiated into her groin, abdomen, and down into her left leg. (Id.). Plaintiff reported taking over-the-counter ibuprofen. (Id.). Dr. Bowen noted that plaintiff no longer worked at Life Care, because she had been terminated on June 26, 2007, for allegedly falling asleep, an allegation which plaintiff denied. (Id.). Dr. Bowen found that plaintiff had negative straight leg raising when sitting, but had a positive straight leg raising when she was at sixty degrees which caused "her to go into a very dramatic posturing on the table and inability to raise her legs after that event." (Tr. 347-348). Dr. Bowen noted that plaintiff was able to forward flex to about sixty degrees but had to lower back to neutral and had "dramatic pain" when she extended back to more than ten degrees especially to the left side. (Tr. 348). Dr. Bowen noted that plaintiff's MRI revealed a small central disc protrusion at L4-5 and L-S1 with a mass effect on the ventral thecal sac without contributing to any significant central stenosis[12]. (Id.). He also found that there was a suggestion of L4-5 posterior annular tear and that there was mild lumbar facet hypertrophy. (Id.). Dr. Bowen's impression was that plaintiff's left sided SI

---

[12] Stenosis is a stricture of any canal or orifice. Stedman's at 1832.

area pain was of "questionable etiology." (Id.). He also found that plaintiff's examination was "very dramatic and inconsistent." (Id.). Dr. Bowen found that there was no evidence of any lower motor neuron changes distally but that there was proximally with give way secondary to pain. (Id.). Dr. Bowen noted that "[s]he is in such exquisite pain today or exquisite pain presentation that it is very difficult on examination to determine where her pain is emanating from." (Id.). Dr. Bowen prescribed Naprosyn and gave plaintiff a Lidoderm[13] patch for pain relief so that he could decrease plaintiff's pain and get a more sensitive evaluation of her. (Id.).

On August 8, 2007, plaintiff returned to Dr. Bowen for a follow up visit, at which time plaintiff reported that her pain was about a four out of ten on average, as opposed to a ten out of ten the prior week. (Tr. 349). Plaintiff reported that the Lidoderm patches seemed to help a great deal, but that they made her leg numb, so she could only use them at night. (Id.). Plaintiff also reported that the Naprosyn had helped quite a bit. (Id.). Plaintiff's straight leg raising test was negative in both sitting and lying positions. (Id.). Plaintiff had full strength in her lower extremities, except for some decreased strength in her left hip abductor. (Id.). Dr. Bowen diagnosed plaintiff with left sided SI pain and iliolumbar[14] pain secondary to a work related incident. (Id.). Dr. Bowen recommended that plaintiff attend physical therapy three times per week for a period of three to four weeks and begin a back strengthening program. (Id.). Dr. Bowen continued the Lidoderm patches and Naprosyn. (Id.).

---

[13] Lidoderm is indicated for relief of pain associated with post-herpetic neuralgia, with its active ingredient being lidocaine. See PDR at 1114-1115.

[14] The iliolumbar ligament is the strong ligament that connects the fourth and fifth lumbar vertebrae with the ilium, spanning the "notch" between the vertebral column and the wing of the ilium. Stedman's at 1085.

On September 5, 2007, plaintiff presented to Dr. Bowen, at which time plaintiff had undergone twelve episodes of physical therapy, which seemed to help her some, but plaintiff reported that she continued to have left leg pain, low back pain, and some numbness in her legs. (Tr. 351). Dr. Bowen noted that plaintiff's physical examination was essentially unchanged from her previous visit. (Id.). Dr. Bowen's impression was left sided SI pain and iliolumbar pain secondary to work-related injury in April, which may be consistent with discogenic pain with referral into that area or lumbar facet referred pain into the SI area. (Id.). Dr. Bowen recommended that plaintiff go to the Pain Clinic for consideration for epidural steroids or facet injections. (Id.). Dr. Bowen also recommended limited duty at work and restricted plaintiff from lifting anything heavier than twenty pounds or more than ten pounds on a repetitive basis. (Id.). Dr. Bowen also restricted plaintiff from any climbing, lifting, or squatting. (Id.).

On September 14, 2007, plaintiff called Dr. Bowen office and reported that the Naprosyn was making her side hurt. (Tr. 352). Dr. Bowen instructed plaintiff to stop taking Naprosyn, and prescribed Ultram.[15] (Id.).

On September 25, 2007, plaintiff presented to Dr. Bowen, at which time she reported that she was "100% better than when she first started," and then stated that she had pain, especially when she sits upright or does any kind of activity. (Tr. 354). Plaintiff rated her pain as a four at its worst, and a zero at its best. (Id.). Plaintiff's straight leg raising test was negative, and she had full strength in her lower extremities. (Id.). Dr. Bowen recommended that plaintiff continue using the Lidoderm patches as needed, continue with her core strengthening exercises, and follow

_____

[15]Ultram is indicated for the management of moderate to moderately severe chronic pain in adults who require around the clock treatment of their pain for an extended period of time. See PDR at 2429.

- 17 -

up with the Pain Clinic. (Id.).

On September 27, 2007, plaintiff presented to Jason D. Oberle, M.D. at Saint Francis Medical Center Pain Clinic upon the referral of Dr. Bowen. (Tr. 306). Upon examination, plaintiff was non-tender to palpation at the lumbosaral spine. (Id.). Dr. Oberle attempted to administer a lumbar epidural steroid injection twice, however, upon insertion of the needle at the L4/L5 interspace, plaintiff complained of terrible left lower lumbar paraspinous pain. (Id.). Dr. Oberle noted that this was not the typical response, and he did not continue, because it would be difficult to perform the procedure safely at that time. (Id.). Dr. Oberle indicated that it seemed as though plaintiff was having a bad muscle spasm in that area. (Id.). Dr. Oberle noted that plaintiff was very apprehensive about any sort of needle intervention, and Dr. Oberle thought it was doubtful plaintiff would want to have any other blocks performed in the future. (Id.).

On October 16, 2007, plaintiff presented to Dr. Bowen at Orthopaedic Associates, at which time she rated her pain as a three at its best and a ten at its worst. (Tr. 356). Plaintiff reported that she was able to keep the pain under control by using the Lidoderm patches when it flares up, and also occasional Naprosyn and ibuprofen. (Id.). Dr. Bowen noted that plaintiff reported to have "bought a girdle which she wears when she wants to go to the club, and she says that she cannot really dance like she used to but she can move around as long as she has the girdle in place." (Id.). Plaintiff reported that the previous night her pain had been a ten after she had moved an end table to vacuum underneath it. (Id.). Plaintiff reported that her pain on this current visit was about a three. (Id.). Upon physical examination, plaintiff had tenderness to superficial palpation, negative straight leg raise test, full strength in the lower extremities, intact sensation, and normal deep tendon reflexes. (Id.). Dr. Bowen continued plaintiff on the

Lidoderm patches and Naprosyn.  (Id.).  Dr. Bowen noted that plaintiff was not interested in any more intervention, including the use of long acting Ultram.  (Id.).  Dr. Bowen found that plaintiff was maximally medically improved.  (Id.).

On October 17, 2007, Angie Sellers, MPT, noted that plaintiff had presented to Southeast Missouri Hospital Outpatient Rehab for twelve physical therapy visits.  (Tr. 370).  Ms. Sellers found that the plaintiff's range of motion of the lumbar spine had improved, but plaintiff continued to demonstrate weakness in the left leg.  (Id.).  Dr. Sellers also noted that plaintiff's gait had improved, and that plaintiff ambulated with a normal gait pattern at times.  (Id.).

On January 9, 2008, a nurse practitioner at Midtown Family Medical Center completed a Medical Examination Report for Caregivers and Staff, in which it was found that plaintiff was restricted to lifting no more than twenty pounds.  (Tr. 377).

On January 21, 2008, plaintiff presented to Lisa Kail, N.P. at Midtown Family Medical Center with complaints of back, neck, and shoulder pain; and muscle spasms due to lifting children at a daycare.  (Tr. 375-76).  Plaintiff also reported tingling in her hands.  (Tr. 376).  Ms. Kail diagnosed plaintiff with muscle spasm.  (Tr. 375).  Ms. Kail excused plaintiff from work for one week, and prescribed Flexeril and Naproxen.

In February of 2009 and February of 2010, plaintiff sought treatment for her diabetes.  (Tr. 384, 386-87).  Plaintiff was prescribed Metformin, blood glucose strips, and a blood glucose monitor.  (Tr. 384, 386-387).

### The ALJ's Determination

The ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act

through December 31, 2011.

2.  The claimant has not engaged in substantial gainful activity since April 23, 2007, the alleged onset date (20 CFR. 404.1571 et seq., and 416.971 et seq.).

3.  The claimant has the following severe impairments: a lumbar strain with early degenerative disc disease at L4-5 and L5-S1 and facet arthritis at L4-5 (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can only occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl with only occasional exposure to ladders, ropes, and scaffolds.

6.  The claimant is able to perform past relevant work as a daycare worker and packer and assembly line worker (20 CFR 404.1565 and 416.965).

7.  The claimant was born on December 29, 1967 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 23, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 7-15)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on January 23, 2008, the claimant is not disabled under sections 216(I) and 223 (d) of the Social Security Act.

> Based on the application of supplemental security income filed on January 23, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 15).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.  Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in

Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.    Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in failing to properly develop the record regarding plaintiff's physical limitations.  Plaintiff next argues that the ALJ erred in determining plaintiff's residual functional capacity.  Plaintiff finally argues that the ALJ erred in assessing plaintiff's credibility.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

**1.    Credibility Analysis**

Plaintiff argues that the ALJ erred in determining the credibility of plaintiff's subjective complaints of pain and limitation.  Defendant contends that the ALJ made a proper credibility determination and found that plaintiff's allegations regarding her limitations were not fully

credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998). Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. Id. The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether she is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints that her pain is at a degree of severity that prevents her from working are credible.

In the present case, the ALJ properly pointed out the Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. With regard to plaintiff's alleged mental impairments, the ALJ noted that, although plaintiff testified that she suffered from depression with daily crying spells and anxiety, the record was devoid of any evidence showing that plaintiff was prescribed medication for depression. (Tr. 10). Furthermore, the ALJ noted that the record shows that plaintiff had never sought or received any mental health treatment, and has never been referred to a mental health professional. (Id.). The absence of treatment for mental health symptoms weighs against plaintiff's subjective complaints as to her mental health symptoms. See Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992).

The ALJ discussed the medical evidence regarding plaintiff's physical impairments and found that it did not support plaintiff's subjective complaints. (Tr. 12-13). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ noted that plaintiff received conservative treatment for her low back pain and that her condition improved. (Tr. 12). In fact, plaintiff informed Dr. Bowen that she went dancing at clubs, which is entirely inconsistent with plaintiff's complaints of disabling pain. (Tr. 356). During that appointment, plaintiff also reported that her pain had increased after she had lifted up a table to vacuum underneath it, an action that is also inconsistent with her reports of pain. (Id.).

Plaintiff testified at the hearing that she took only over-the-counter pain medication in

addition to occasional muscle relaxers. A lack of strong pain medication is inconsistent with subjective complaints of disabling pain. Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

The ALJ pointed out that the record was devoid of any treatment from January 2008 until February 2009, at which time plaintiff was prescribed oral medication for her diabetes. (Tr. 12, ). Plaintiff did not return for treatment until February 2010, again in relation to her diabetes, which plaintiff testified to be under control at the hearing. (Id.). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ also discussed plaintiff's work history. (Tr. 12). The ALJ noted that while plaintiff alleged a disability onset date of April 23, 2007, she continued to work at least through May of 2007, and worked again from August 2008 through December 2009. (Id.). Plaintiff's ability to perform work on a part-time basis during the time in which she alleges she was disabled is inconsistent with plaintiff's allegation of disability and may demonstrate an ability to perform substantial gainful activity. See 20 C.F.R. § 404.1571, 416.971; Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). As such, the ALJ properly determined that plaintiff's ability to perform work after her alleged onset of disability detracted from her credibility. Further, at the administrative hearing, plaintiff testified that she had lost her most recent job, because she was fired for reporting another worker, not because of her disability. (Tr. 30).

The ALJ discussed plaintiff's daily activities, noting that plaintiff testified that she was able to perform household chores, shop, drive, attend appointments, bathe and dress herself, and care for her husband and children. (Tr. 10, 13). Significant daily activities may be inconsistent with

claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ stated that, to the extent plaintiff's daily activities are restricted, they are restricted by her choice. (Tr. 13).

Finally, the ALJ noted that plaintiff walked in out and out of the hearing room, sat normally, and moved without noticeable difficulty. (Tr. 13). While an ALJ cannot accept or reject subjective complaints solely on the basis of personal observations, an ALJ's observations of a claimant's appearance and demeanor during the hearing is a proper consideration. See Johnson v. Apfel, 240 F.3de 1145, 1148 (8th Cir. 2001); Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir. 1997).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining plaintiff's RFC. Plaintiff argues that the ALJ did not cite medical evidence in support of his determination.

It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001)

(quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545. It is the claimant's burden, and not the Social Security Commissioner's burden to prove the claimant's RFC. Pearsall, 274 F.3d at 1218. Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).

The ALJ made the following determination with regard to plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that she can only occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl with only occasional exposure to ladders, ropes, and scaffolds.

(Tr. 11).

Substantial evidence exists in the record to support the ALJ's RFC determination. Although plaintiff contends that the ALJ failed to cite medical evidence in support of his determination, the objective medical evidence is consistent with the ALJ's finding. On September 5, 2007, Dr. Bowen restricted plaintiff to lifting no more than twenty pounds occasionally or ten pounds on a repetitive basis. (Tr. 351). Dr. Bowen also restricted plaintiff from any climbing or squatting. (Id.). On a subsequent visit with Dr. Bowen on September 25, 2007, plaintiff reported that she was "100 % better than when she first started" treatment. (Tr. 354). Plaintiff rated her pain as a four at its worst, and a zero at its best. (Id.). Upon examination, plaintiff's straight leg

raising test was negative, and she had full strength in her lower extremities. (Id.). On October 16, 2007, plaintiff reported that she was able to keep her pain under control with medication. (Tr. 356). Plaintiff also indicated that she was able to go dancing at clubs as long as she wore a girdle. (Id.). Plaintiff's physical examination revealed a negative straight leg raise test, full strength in the lower extremities, intact sensation, and normal deep tendon reflexes. (Id.). Dr. Bowen found that plaintiff was maximally medically improved at that time. (Id.). On January 9, 2008, a nurse practitioner at Midtown Family Medical Center found that plaintiff was restricted to lifting no more than twenty pounds. (Tr. 377).

The ALJ's RFC determination is also consistent with plaintiff's own testimony. Plaintiff testified that she could lift up to twenty pounds. (Tr. 36). Plaintiff indicated that she was "okay" as long as she did not lift. (Tr. 45). Plaintiff testified that she generally managed her pain with one dosage of over-the-counter pain medication daily. (Tr. 41). Plaintiff further testified that she was able to bend, stoop, crouch, kneel, and crawl, albeit with some difficulty. (Tr. 49).

Further, the ALJ properly found that plaintiff's alleged depression was not a medially determinable impairment. As previously discussed, plaintiff did not receive any form of mental health treatment, did not take any prescribed medication for mental impairments, and did not exhibit any signs of depression. As such, the ALJ properly relied on the finding of state agency psychologist Dr. Toll that plaintiff had no medically determinable mental impairment, and that plaintiff had no work-related limitations resulting from an alleged mental impairment. (Tr. 333).

In sum, substantial evidence exists in the record as a whole to support the ALJ's RFC determination. The ALJ performed a proper credibility analysis and determined that plaintiff's subjective allegations were not entirely credible. The ALJ then assessed a residual functional

capacity that is consistent with the objective medical evidence and plaintiff's own testimony. Plaintiff's treating physician, as well as a nurse practitioner, expressed the opinion that plaintiff was capable of lifting up to twenty pounds, which is consistent with the performance of light work. See 20 C.F.R. § 404.1567(b). The record is not supportive of any greater restrictions than those found by the ALJ.

## 3. Duty to Develop the Record

Plaintiff contends that the ALJ failed to develop the record regarding plaintiff's ability to perform work activities. Plaintiff notes that there was no medical evidence in the record dated after January 2008.

The ALJ has a duty to fully and fairly develop the record, independent of the claimant's burden to press his case. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). This duty is enhanced when the claimant is without the benefit of counsel. Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002). This duty is not never-ending and an ALJ is not required to disprove every possible impairment. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011). The ALJ is charged with developing a reasonable record, and "is not required to function as the claimant's substitute counsel." Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial. Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).

When a claimant's medical records do not supply enough information to make an informed decision, the ALJ may fulfill his duty to develop the record by ordering a consultative examination. Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992) (citing 20 C.F.R. § 416.917)). However, an "ALJ is permitted to issue a decision without obtaining additional medical evidence

so long as other evidence in the record provides a sufficient basis for the ALJ's decision."
Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1999) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

In the present case, the ALJ thoroughly explained to plaintiff the benefits of having a representative or counsel. (Tr. 21- 24). The ALJ informed plaintiff that he would grant her a continuance so that she could obtain counsel. (Tr. 24). The plaintiff chose to proceed without counsel. (Id.). When asked if her file was complete and ready for the hearing, plaintiff responded in the affirmative. (Id.). The ALJ then developed the record regarding plaintiff's education, work history, physical abilities, daily activities, social functioning, pain, ability to concentrate, and medications. (Tr. 28-49).

Plaintiff filed for disability insurance benefits and supplemental security income on January 23, 2008. (Tr. 124-139). The ALJ has a duty to develop plaintiff's medical history for the twelve months preceding the month in which she filed her application. 20 CFR §§ 416.912(d), 404.1512(d) (2011). As such, the ALJ was not obligated to develop the record after January 2008.

As discussed above with respect to the ALJ's RFC determination, the ALJ had adequate medical records, in addition to plaintiff's own testimony, upon which to base his findings. Neither a consultative examination nor further information from plaintiff's physicians were necessary. Further, plaintiff has presented no medical records to the court to support her implication that any medical records are missing. As such, plaintiff has failed to show that the ALJ's development of the record resulted in prejudice or unfairness in her case.

## **Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  4th  day of September, 2012

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE